**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JASON A. STEPHENS,**

       **Plaintiff,**

**v.**                                 **Case No.: 3:12-cv-06244**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

**<u>MEMORANDUM OPINION</u>**

      This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (ECF Nos. 14 and 15). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 8 and 9). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.**     **<u>Procedural History</u>**

      Plaintiff, Jason Stephens ("Claimant") filed for DIB and SSI on August 13, 2009, alleging disability beginning on August 1, 2005, (Tr. at 186, 193), due to severe depression and addiction to pain killers. (Tr. at 227). Claimant subsequently alleged

impairment due to eyesight and vision problems as well. (Tr. at 713-31, 774-90). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 81-90, 95-97). Claimant filed a request for an administrative hearing, which was held on January 15, 2010 before the Honorable Charlie Andrus, Administrative Law Judge ("ALJ"). (Tr. at 39-64). A supplemental hearing was held on January 27, 2011.  (Tr. at 65-76). By decision dated March 14, 2011, the ALJ determined that Claimant was not disabled as defined in the Social Security Act. (Tr. at 21-32). The ALJ's decision became the final decision of the Commissioner on August 7, 2012 when the Appeals Council denied Claimant's request for review. (Tr. at 1-4). On October 4, 2012, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings on December 10, 2012. (ECF Nos. 10 and 11). Thereafter, both parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 14 and 15). Accordingly, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 28 years old on the alleged disability onset date, and 34 years old at the time of the ALJ's decision. (Tr. at 30). He received a GED and communicates in English. (Tr. at 30, 45). His prior employment history includes work as a carpet store owner, a sales and finance manager for a car dealership, and a manager at a Lowe's warehouse. (Tr. at 45, 291).

## III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.

1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain*

*v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" to assess disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree

and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* §§ 404.1520a(e)(2), 416.920a(e)(2).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirement of the Social Security Act through December 31, 2010. (Tr. at 23, Finding No. 1). The ALJ then acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since August 1, 2005, the alleged date of disability onset. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of depression and substance abuse. (Tr. at 23-24, Finding No. 3). The ALJ considered Claimant's complaints of poor vision, but found this impairment to be non-severe. (Tr. at 23-24).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 24-25, Finding No. 4). The ALJ then found that Claimant had the following RFC:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except he can lift up to 50 pounds occasionally; up to 20 pounds frequently; at any one time can sit for four hours at a time; stand for four hours at a time; walk for four hours

at a time; in an eight hour day can sit a total of six hours; stand a total of six hours; can walk a total of six hours; is able to reach, handle, finger, feel, push/pull frequently with both hands; can frequently use both feet for operation of foot controls; can never climb ladders of scaffolds; can occasionally climb stairs, balance, stoop, kneel, crouch, or crawl, can never work at unprotected heights; can never work around moving dangerous machinery; can occasionally operate a motor vehicle; can frequently work in humidity extremes, dust, fumes, temperature extremes, and vibrations; has a mild (slight but can function well) limitation in understanding and remembering complex instruction; carrying out complex instructions; and the ability [to] make judgment on complex instructions; mild limitation in the ability to interact with the public, supervisors and coworkers; and a moderate (more than a slight limitations but able to function satisfactorily) limitation in the ability to respond appropriately to usual work situations and to change in routine work setting.

(Tr. at 25-30, Finding No. 5). As a result, under the fourth inquiry, Claimant was found unable to return to his past relevant employment. (Tr. at 30, Finding No. 6). The ALJ then reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 30-31, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1976 and was defined as a younger individual; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the ALJ's determination that Claimant was "not disabled." (Tr. at 30, Finding Nos. 7-9). Given these factors and Claimant's RFC based upon all of his impairments, the ALJ relied upon the testimony of a vocational expert in finding that Claimant could perform various occupations that existed in significant numbers in the national and regional economy. (Tr. at 31, Finding No. 10). At the light level, Claimant could function as a nongovernmental mail clerk, office helper, and price maker; at the sedentary level, Claimant was capable of performing jobs such as surveillance system monitor, order clerk, and inspector. (Tr. at 31). On this basis, the ALJ concluded that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 32, Finding No. 11).

- 6 -

## IV.   Claimant's Challenges to the Commissioner's Decision

Claimant raises two challenges to the Commissioner's decision. First, Claimant argues that the ALJ failed to develop the medical evidence regarding Claimant's visual impairment. (ECF No. 14 at 10-11). Second, Claimant contends that the ALJ did not properly consider the combined effect of all of Claimant's impairments when comparing the severity of his conditions to the criteria of the relevant Listings. (*Id.* at 11-12).

## V.   Relevant Medical History

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A.  Mental Health Treatment

#### 1.   *July 2007 – May 2009*

Between July 2007 and March 2009, Claimant attended approximately monthly counseling sessions with therapist Fannie Loughridge, M.A., L.P.C., C.A.C., for complaints of substance abuse and depression.[1] (Tr. at 301-10). From July 2007 to September 2008, Claimant reported doing relatively well with anti-depressants, while Ms. Loughridge consistently observed that his mood was good and his affect was bright. (Tr. at 308-310). During this period, Claimant was not working, but did report that he was working vigorously on his campaign for election to a local magistrate position. (Tr. at 309). Pursuant to Ms. Loughridge's referral, Claimant also began substance abuse treatment with Timothy Saxe, M.D. who managed his medications. (Tr. at 286-87). In a service note dated November 25, 2008, Dr. Saxe reported that Claimant "[s]tates he has been depressed since starting Suboxone treatment program and stopping oxycontin,"

---

[1] In a letter dated December 10, 2008, Ms. Loughridge stated that Claimant's start date of service had begun individual therapy sessions with beginning in November 2005.  (Tr. at 650). However, treatment notes prior to July 2007 are not contained in the administrative transcript.

- 7 -

which Claimant believed had kept him from being depressed. (Tr. at 287). However, on December 1, 2008, Claimant reported that he was discharged from substance abuse treatment program for taking non-prescribed Percocet pills. (Tr. at 307). Ms. Loughridge observed that Claimant's mood was fair but his depression had increased. (*Id.*).

On December 10, 2008, Ms. Loughridge stated in a letter that Claimant was "currently attending individual therapy sessions with a start date of service in November 2005" and that "[d]ue to increased symptoms of depression, Mr. Stephens has recently been unable to continue employment and has been forced to reside with his mother and father for assistance." (Tr. at 650). On December 30, 2008, Ms. Loughridge observed that Claimant was "having some withdrawal symptoms from Suboxone," and that his mood was down and his depression had increased. (Tr. at 307). She referred Claimant to Emery Brad McCoy, D.O., for medication management. (*Id.*).

On January 16, 2009, Dr. McCoy began managing Claimant's medication. (Tr. at 295). Dr. McCoy's mental status exam was entirely unremarkable, as Claimant's appearance, speech, psychomotor behavior, attitude, eye contact, thought processes, thought content, mood, affect, cognition, and insight were all within normal limits or otherwise appropriate, while he denied suicidal or homicidal ideations. (*Id.*). Dr. McCoy diagnosed Claimant with opioid relapse and indicated that Claimant should continue taking Subutex and Cymbalta. (*Id.*). Dr. McCoy met with Claimant four more times between January 23 and February 27, 2009, during which Claimant continued to do well on Subutex. (Tr. at 296-300). Dr. McCoy's mental status evaluations and diagnoses remained unchange throughout this period. (*Id.*).

In February 2009, Claimant reported that he was "doing okay" while Ms.

Loughridge observed that Claimant's mood was down and his affect was flat. (Tr. at 306). In March 2009, Claimant reported that he was "still very depressed," though he continued with his medication regimen, and Ms. Loughridge observed that Claimant's mood was good/fair while his affect was appropriate. (*Id.*). In May 2009, Ms. Loughridge noted that Claimant had been discharged from Dr. McCoy's care due to a positive urine screen for opiates. (Tr. at 305).

On August 19, 2009, Ms. Loughridge completed a treating source evaluation of Claimant for the West Virginia Disability Determination Section, consisting of a mental status exam and functional capacity opinion as of March 10, 2009, the date of her last treatment session with Claimant. (Tr. at 301-04). In the mental status exam, Ms. Loughridge observed that Claimant's affect was flat and his mood was depressed, whereas Claimant's orientation, speech, judgment, perception, insight, thought content, and psychomotor activity were all within normal limits or otherwise appropriate and he denied having delusions, hallucinations, suicidal ideations, and homicidal ideations. (Tr. at 302). Ms. Loughridge opined that Claimant's social functioning was mildly deficient, while his immediate memory, recent memory, social functioning, concentration, task persistence, and pace were all normal. (Tr. at 303). Ms. Loughridge diagnosed Claimant with opioid dependence and depressive disorder not otherwise specified, and assigned him a Global Assessment of Functioning ("GAF") score of 60.[2] (Tr. at 304).

---

[2] The GAF scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders ("DSM"), IV-Text Revision* Americ. Psych. Assoc, 32 (4th Ed. 2002). On the GAF scale, a higher score correlates with a less severe impairment. For example, a GAF score between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34. It should be noted that in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned as a measurement tool.

### 2. *June 2009 – December 2010*

On June 10, 2009, Claimant began mental health and opioid addiction treatment at Prestera Center for Mental Health. (Tr. at 432-33, 461-90). During intake, Claimant reported "using Oxycontin in the amounts of 140-160 mgs daily by nasally," and that he had "experienced depression but he is unsure if it is from the drug use or if it [is] why he uses drugs." (Tr. at 487). Claimant also reported "that he cannot find a job because he is too busy getting high." (*Id.*). Claimant's mental status exam reflected that his posture was normal but slumped, sensorium was drowsy, mood was depressed, and affect was flat but appropriate, while his insight and judgment were both poor. (Tr. at 489-90). Claimant also reported experiencing insomnia and diminished appetite, but denied suicidal/homicidal ideations or hallucinations. (Tr. at 489). All other observations, including Claimant's hygiene, gait, attitude, eye contact, attention span, impulse control, intellectual functioning, thought content and memory were within normal limits or otherwise unremarkable. (Tr. at 489-90). Claimant was diagnosed with "opioid dependence" and "major depressive disorder recurrent – severe without psychotic" and assigned a GAF score of 45.[3] (Tr. at 471-72).

Claimant was admitted to Prestera's residential detox program on June 17, 2009. (Tr. at 444-50). On June 18, 2009, a Prestera physician conducted a physical examination of Claimant, which included an interview reviewing his psychiatric and substance abuse history, a thorough physical and neurological examination, a mental status examination, and a diagnostic impression. (Tr. at 434-41). Claimant reported that his opioid relapse had begun three months prior, and he was diagnosed with "(1) opioid

---

[3] A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment.

dependency, (2) rule out substance induced mood disorder with mood disorder, (3) rule out situational depression (loss of business), (4) rule out amphetamine abuse." (Tr. at 434-35). In his physical examination, Claimant presented as "healthy except self-claimed GERD." (Tr. at 437). Notably, Claimant reported a past medical history with vision problems, but described his vision as "good" in the review of systems.[4] (*Id.*). In the mental status examination, Claimant's mood was down with anxiety, and regarding his attitude, the physician noted that Claimant was currently only interested in detox, but would think over extended substance abuse treatment. (Tr. at 441). Claimant's orientation, speech, perception, thought content, insight, and judgment were all unremarkable. (*Id.*).

According to treatment notes, also dated June 18, 2009, Claimant reported that "his use of opiates began with a prescription to Lorotab, due to a car accident in 1999, but he did not begin abusing opiates until about 5 years ago." (Tr. at 404). Claimant again reported "that his drug use has interfered with his ability to seek and attain employment and he has experienced conflicts with family members due to continued substance use." (*Id.*). Claimant was diagnosed with "opioid dependence" and "major depressive disorder recurrent–severe without psychotic," and assigned a GAF score of 45. (Tr. at 416-17).

On June 24, 2009, Claimant's mental status exam reflected that his posture was normal but slumped, mood was depressed, affect was flat, insight was fair, and judgment was poor. (Tr. at 517-18). Otherwise, Claimant's hygiene, gait, attitude, eye contact, attention span, impulse control, sleep, appetite, intellectual functioning, thought content and memory were within normal limits or otherwise unremarkable.

---

[4] A Nursing Assessment dated June 17, 2009 similarly indicated that Claimant's pupils were equal and round, and his vision was "Fair," although his glasses were apparently broken. (Tr. at 495).

(*Id.*). Claimant reported that he "realize[d] he needs treatment in order to maintain recovery." (Tr. at 518). He also reported that "he used just to not feel sick, as at this point he has such a high tolerance that he is unable to get high-feel the effects." (Tr. at 515). On June 30, 2009, Claimant's mental status exam reflected that his mood was reported as "sick," affect was constricted, and his insight and judgment were both poor. (Tr. at 442). Otherwise, Claimant's sensorium, attitude, appearance, thought speech, thought process, thought content, perception, motor activity, memory, abstraction, concentration, and intelligence were within normal limits or were otherwise unremarkable. (*Id.*). Claimant was diagnosed with "opiate dependence," "depressive disorder no other symptoms," "rule out major depressive disorder," and assigned a GAF score of 40.[5] (Tr. at 443).

In July 2009, Claimant met weekly with Dr. Soleymani, who indicated that Claimant was tolerating Suboxone well and that taking Remeron helped with his sleep. (Tr. at 396-99). Between August 2009 and December 2009, Claimant attended group and individual counseling sessions, as well as AA/NA meetings. (Tr. at 334-41, 344-99, 527). Claimant continued to tolerate Suboxone well, but his difficulties with depression, sleep, and motivation persisted. (*Id.*). On September 8, 2009, Claimant reported that he was "learning to deal with emotional stress" and that group therapy sessions were helping. (Tr. at 388). In October 2009, Claimant's depression persisted, although he continued to attend individual and group counseling sessions, as well as AA/NA meetings. (Tr. at 352-70). On October 27, 2009, Claimant's mental status exam reflected that his affect was flat, but his mood, behavior, thoughts, and eye contact were normal,

---

[5] A GAF score of 31-40 indicates that the patient had some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

and he denied suicidal or homicidal ideations. (Tr. at 654). In November 2009, Claimant's condition remained relatively the same. (Tr. at 339-41, 344, 346-51). On November 24, 2009, Claimant reported that he was "still suffering from major depression," although his mental status exam revealed that his affect, mood, behavior, and thoughts were all normal or otherwise appropriate, and he denied suicidal or homicidal ideations. (Tr. at 344). In December 2009, Claimant continued to experience depression, although it fluctuated somewhat. (Tr. at 336-38, 345). On December 10, 2009, Claimant's mental status exam reflected that his mood was reported as "not as bad," while his affect, behavior, and thoughts were normal or otherwise appropriate, and he denied suicidal or homicidal ideations. (Tr. at 345).

Between January 2010 and April 2010, Claimant continued to tolerate Suboxone well and showed some improvements with his depression. (Tr. at 311-33, 634-36). In January 2010, Claimant continued to experience depression, but reported being more active than before, that he had been "forcing himself to spend time with family members and 'put on a smile,'" and that he felt more hope. (Tr. at 331-33). On both January 6 and 21, 2010, Claimant's mental status exams reflected that his mood was reported as "not bad," while his affect, behavior, and thoughts were normal or otherwise appropriate, and he denied suicidal or homicidal ideations. (Tr. at 331, 333). In February 2010, Claimant's depression persisted, although he reported that stressors had alleviated somewhat and that relaxation techniques were helping him with sleep, motivation, and "keep[ing] his emotions from 'exploding' when he gets upset." (Tr. at 324-27). On February 4, 2010, Claimant's mental status exam reflected that his affect, mood, behavior, and thoughts were all normal or otherwise appropriate, and he denied suicidal or homicidal ideations. (Tr. at 324). In March 2010 and April 2010, Claimant's

condition was somewhat exacerbated by his mother's sudden illness. (Tr. at 311-18, 636). On March 12, 2010, Claimant reported that he was tempted to use painkillers the week prior, after his mother was rushed to the hospital. (Tr. at 314). However, he was able to avoid relapse by attending AA/NA meetings, and thus reported that his depression had lessened upon his mother's return home. (*Id.*). Claimant's mental status exam reflected that his mood was "not so good," but his affect, behavior, and thoughts were all normal or otherwise appropriate, and he denied suicidal or homicidal ideations. (Tr. at 314-15). On April 13, 2010, Claimant reported that he continued to have depression, but that his medication "ha[d] been helping with his depression" and he was "not as tense as before." (Tr. at 636).

In May 2010, Claimant's mother was diagnosed with terminal cancer and subsequently passed away within the month. (Tr. at 621-28, 632). On May 11, 2010, Claimant's therapist approached him regarding his "lack of participation in group and individual therapy in the past 2 months," and Claimant reported that he had been occupied by his mother's declining health. (Tr. at 623). Claimant reported that he was "angry with the treatment his mother is receiving in the hospital" and indicated that his mother's health was more important than his own recovery. (*Id.*). Claimant's mental status exam reflected that his mood was reported as "enraged," his affect and behavior were agitated, and his thoughts were tangential, but he denied suicidal or homicidal ideations. (*Id.*). On May 14, 2010, Claimant reported that he was "not doing well," as his mother had been diagnosed with terminal cancer. (*Id.*). Claimant stated that "it has been hard on him but overall [he was] coping well," and that his medications helped with his pain, anxiety, and sleep. (*Id.*). On May 26, 2010, Claimant reported that "his mother had passed away and that he was having some difficulty coping," but that he had

been keeping busy with visiting family members and had not had any cravings or thoughts of using pain killers. (Tr. at 625). Claimant's mental status exam reflects that he reported his mood as "okay," while his affect was appropriate, his thoughts were coherent, and he denied suicidal or homicidal ideations. (*Id.*). In June 2010, Claimant struggled with grief, but continued to tolerate Suboxone well. (Tr. at 629-30, 644-47). On June 4, 2010 Claimant reported feeling "numb, angry and resentful" regarding his mother's death, and "fear[ful] about how he will 'survive without her' as she took care of helping him to meet his basic needs." (Tr. at 646). Claimant's mental status exam reflects that his affect was tearful while his mood was reported as "better," his behavior, thoughts, and appearance was normal, and he denied suicidal/homicidal ideations. (Tr. at 647). On June 9, 2010, Claimant reported that he had "surprised himself by not using [opioids] even though 'something so tragic happened in [his] life.'" (Tr. at 644). Claimant reported that he was "afraid of 'going back to that dark hole' of depression that he had been experiencing prior to his mother's illness." (*Id.*). However, in his mental status exam, Claimant reported his mood as "okay," while his affect, behavior, thoughts, appearance, and eye contact were normal or otherwise appropriate, and he denied suicidal or homicidal ideations. (Tr. at 644-45).

On July 8, 2010, Claimant's therapist, Crystal Hedrick reassessed Claimant "to determine if he would benefit from continued participation in the Suboxone program," which he had participated in for the past year. (Tr. at 666-67). Claimant reported that "his last administration of opioids was approximately 1 year" prior, and Ms. Hedrick concluded that he "would benefit from continued participation in the Suboxone program." (Tr. at 666). Claimant was again diagnosed with "opioid dependence" and "major depressive disorder, recurrent, severe without psychotic features," and assessed

a GAF score of 45. (Tr. at 667). Claimant's mental status exam reflected that his sociability was withdrawn, coping ability was "overwhelmed," and affect was blunted, whereas his appearance, speech, thought content, orientation, and recall memory were all within normal limits or otherwise appropriate. (Tr. at 676-77).

In July 2010 and August 2010, Claimant continued to tolerate Suboxone well, but he struggled with grief over his mother's passing and his depression and OCD symptoms reportedly worsened. (Tr. at 749-55, 668-70). In August 2010, Claimant also reported deterioration in his relationship with his father. (Tr. at 668-70). On August 6, 2010, Dr. Soleymani observed that Claimant's mood was sad and his affect was constricted; however, his orientation, speech, thought form, thought content, and motor activities were appropriate or otherwise unremarkable. (Tr. at 752). Dr. Soleymani diagnosed Claimant with "opiate dependency," "major depressive disorder moderate to severe," and "obsessive compulsive disorder." (*Id.*).

Between October 2010 and December 2010, Claimant's depression and obsessive compulsive symptoms increased, but he avoided relapse. (Tr. at 745-48, 937-65). On October 1, 2010, Claimant reported having a "rough time" with depression, OCD symptoms, poor motivation, and sleep difficulty. (Tr. at 748). On October 29, 2010, Claimant reported that both his depression and OCD symptoms had increased. (Tr. at 955). On November 16, 2010 Claimant reported an increase in depression and OCD symptoms, although he also reported that he had stopped taking Remeron, "which could be the reason for increased depression." (Tr. at 947). However, on November 30, 2010, Claimant again reported an increase in depression and OCD symptoms, and stated that he was not doing well. (Tr. at 943). In December 2010, Claimant continued to grieve the loss of his mother, and reported an increase in depression, anxiety and OCD symptoms,

remarking that he was "sinking further back down into the black hole of depression." (Tr. at 963, 965). He also expressed apprehension regarding the impending tapering of his Suboxone prescription. (*Id.*).

Between January 2011 and May 2011, Claimant's depression and OCD symptoms persisted, but he successfully began tapering off Suboxone without relapse. (Tr. at 905-35, 967-71, 991-1033). On January 6, 2011, Claimant's mental status exam reflected that his coping ability was impaired by deficient skills, but his appearance, sociability, speech, thought content, orientation, recall memory, and affect were all normal or otherwise appropriate, and he was assessed a GAF score of 58. (Tr. at 1001-03). On January 17, 2011, Claimant's mental status exam was largely unchanged, except that his coping ability was observed as "overwhelmed," and assigned him a GAF score of 45. (Tr. at 1023-25). On January 21, 2011, Claimant reported that he was "not doing better," and explained that he "continue[d] to feel stable but with symptoms" of depression, lack of motivation, social withdrawal, sleep problems. (Tr. at 929). Although Claimant also reported obsessive compulsive symptoms, he noted that they had decreased since he began taking Risperdal. (*Id.*). Dr. Soleymani observed that Claimant's affect continued to be restricted, but his insight and judgment were fair, and Claimant denied having hallucinations, delusions, or thoughts of harming himself or others. (*Id.*). Dr. Soleymani diagnosed Claimant with "major depressive disorder moderate to severe," "generalized anxiety disorder, rule out OCD," and "opiate dependence." (Tr. at 931). In February 2011, Claimant continued to struggle with depression and lack of motivation. (Tr. at 969). In March 2011, Claimant reported ongoing family struggles with his father and brother, as well as difficulties with "sweats, legs shaking, and [his] stomach tying up in knots" due to the Suboxone decrease. (Tr. at 971). In April 2011, Claimant reported that

he was "still depressed" and had a poor energy level. (Tr. at 917). In May 2011, Claimant reported that his OCD symptoms had worsened, but he was sleeping well and had no major problems with drug cravings. (Tr. at 911).

On June 23, 2011, Ms. Hedrick completed a year-long treatment plan for Claimant, which included continued individual and group therapy sessions, and medication management. (Tr. at 1079-93). Claimant was again diagnosed with "opioid dependence" and "major depressive disorder, recurrent, severe without psychotic features" and assigned a GAF score of 45. (Tr. at 1079-81).

### B. Eye and Vision Treatment

On March 22, 2001, Claimant was examined by Dr. Joseph A. LoCascio, III, M.D. based upon his complaints of "seeing floaters" in his eyes for two weeks. (Tr. at 723). Claimant also complained of blurred vision off and on in the left eye. (*Id.*). On March 28, 2001, Claimant underwent surgery for "retinal holes with cuffed attachments times two inferiorly and a retinal traction with a retinal flap tear superiorly all in the right eye." (Tr. at 720). Dr. LoCascio observed that Claimant "tolerated the procedure well" and "left the Operating Room in satisfactory condition," and that there were no complications. (*Id.*). In a follow-up examination conducted the following day, Dr. LoCascio observed that Claimant "got along well," although his right eye felt sore and irritated, and his vision was blurry. (Tr. at 722). On April 30, 2001, Claimant reported that "he has been having sharp pain in right eye," but Dr. LoCascio observed that his vision was unaffected and there was no redness or discharge. (Tr. at 719). On August 6, 20o1, Claimant complained of seeing "floaters" when out in the sun and experiencing intermittent sharp shooting pain in his right eye lasting for a few seconds. (Tr. at 718). He also thought his right pupil was larger than his left pupil. (*Id.*).

On February 28, 2002, Claimant requested glasses from Dr. LoCascio for distance clarity, but reported that his vision acuity was good and unchanged, and that he had no other complaints. (Tr. at 717).

On January 9, 2004, Claimant reported to Dr. Cascio that he was still seeing floaters and still thought his right pupil was larger than his left pupil. (Tr. at 715).  On March 22, 2004 and June 25, 2004, Claimant failed to attend his scheduled eye appointments with Dr. Craig M. Morgan, M.D. (Tr. at 789-90). On November 11, 2004, Claimant was treated by Dr. Morgan, who diagnosed Claimant with blepharitis and posterior vitreous degeneration, and noted his previous treatment for retinal tearing. (Tr. at 787-88).

On March 31, 2005, Claimant was treated by Dr. LoCascio after he "started seeing flashes of light" lasting 2-3 seconds. (Tr. at 713). However, his vision acuity seemed unchanged. (*Id.*). Dr. LoCascio diagnosed Claimant with lattice degeneration and myopia, and instructed him to return in 1 year. (Tr. at 713).

Claimant failed to appear and canceled his appointments with Dr. Morgan, on November 28, 2005, and March 2, 2006, respectively. (Tr. at 784-86). On March 30, 2006, Claimant was examined by Dr. Morgan for follow up management of his previously treated retinal tear. (Tr. at 781). Dr. Morgan observed no changes in his visual acuity. (*Id.*). Claimant was diagnosed with blepharitis, dermatochalasia, lattice, and posterior vitreous degeneration, for which Dr. Morgan "emphasize[d] [the] importance of compliance" and instructed Claimant to "check vision daily, each eye separately" and "to call, if vision changes." (Tr. at 782).

On March 23, 2007, Claimant was examined by Dr. Morgan for follow up management of his retinal tear and lattice. (Tr. at 779). Dr. Morgan observed no changes

in Claimant's current eye history, and diagnosed him with blepharitis, cataract – clear, dermatochalasia, lattice, posterior vitreous degeneration, and retinal atherosclerosis. (Tr. at 780). Again, Dr. Morgan "emphasize[d] [the] importance of compliance" and instructed Claimant to "check vision daily, each eye separately" and "to call if vision changes." (*Id.*).

On May 13, 2008, Dr. Morgan mailed Claimant a brief form letter indicating that he had missed or canceled his last appointment. (Tr. at 774). Dr. Morgan urged Claimant to seek follow-up treatment from an eye specialist, and warned him of the risk of irreversible vision loss if he failed to receive appropriate follow up care. (*Id.*).

### C. Physical/Psychological Evaluations and RFC Assessments

#### 1. *Mental/Psychological Evaluations*

On February 2, 2009, licensed psychologist Lisa C. Tate, M.A., completed a Psychological Examination of Claimant, which consisted of a clinical interview and a mental status examination. (Tr. at 289-93). In her general observations, Ms. Tate noted that Claimant "walked with a normal gait and maintained a normal posture," he had "good use of all limbs" and "no apparent vision problems" or hearing problems. (Tr. at 289). During the interview portion of the evaluation, Ms. Tate reviewed Claimant's chief complaints and presenting symptoms, as well as his medical, substance abuse, mental health, educational, vocational, developmental/social, and legal histories. (Tr. at 290-91). Claimant reported problems with depression which began after the death of his best friend in 2005, and pain medication dependency which developed after he was injured in a car accident. (Tr. at 290). At the time of the interview, Claimant had been taking Subutex for the past two months as part of his substance abuse treatment. (*Id.*). The results of Claimant's mental status exam were entirely unremarkable or otherwise

within normal limits: Claimant was alert and oriented to person, place, time and date; his mood was euthymic; his affect was broad and reactive; his thought processes were logical and coherent; his thought content was devoid of delusions, obsessive thoughts or compulsive behaviors; he reported no perceptual experiences; his insight was fair and his judgment was within normal limits; he denied suicidal or homicidal ideations; his immediate, recent, and remote memories were all within normal limits; his concentration as within normal limits, and his psychomotor behavior was normal. (Tr. at 291).

Nevertheless, Ms. Tate diagnosed Claimant with "major depressive disorder, single episode, severe" and "opioid dependence, in remission with Subutex" based upon Claimant's reports, as well as "chronic neck pain, headaches, and stomach problems" which were also "by self-report." (Tr. at 292). Ms. Tate documented Claimant's activities of daily living as consisting of watching television, showering every three days, taking out the trash and grocery shopping weekly, and attending doctor's appointments five times per month. (*Id.*). Ms. Tate further observed that his social functioning, concentration, persistence, and pace were all within normal limits. (*Id.*).

On September 30, 2009, Dr. Charles M. Tucker, Ph.D. provided a consultative Psychiatric Review Technique and Mental RFC opinion of Claimant. (Tr. at 571-84). Dr. Tucker opined that Claimant's impairments were severe but not expected to last 12 months. (Tr. at 571). Dr. Tucker diagnosed Claimant with major depressive disorder and opioid dependency in treatment. (Tr. at 574, 579). He opined that Claimant was mildly limited in his activities of daily living and moderately limited in his abilities to maintain social functioning and to maintain concentration, persistence, or pace. (Tr. at 581). Dr. Tucker noted that Claimant began treatment for opioid dependence on June 30, 2009,

and by July 17, 2009 he was being seen weekly, and was taking medication both for depression and opioid dependence. (Tr. at 583). In his Mental RFC opinion, Dr. Tucker concluded that Claimant was moderately limited in his abilities to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to set realistic goals or make plans independently of others. (Tr. at 567-68). Claimant was not significantly limited in any other aspects of his Understanding and Memory, Sustained Concentration and Persistence, Social Interaction, or Adaptation. (*Id.*).

On October 7, 2009, Dr. Tucker completed a case analysis, and concluded that the "additional MER from Prestera Center for Mental Health of 7/21/09 through 9/22/09 supports the adjudication [that] impairment will not last twelve months as he has demonstrated improvement in this period." (Tr. at 591). Thus, Dr. Tucker affirmed the August 30, 2010 Psychiatric Review Technique assessment "on the basis of analysis of evidence in file." (*Id.*).

On January 8, 2010, Dr. Timothy Saar, Ph.D. conducted a Psychiatric Review Technique of Claimant, in which he concluded that Claimant's mental impairments were not severe. (Tr. at 604-17). Dr. Saar diagnosed Claimant with depression and opioid dependency, but opined that he was only mildly limited in his activities of daily living,

maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. at 607, 612, 614). Dr. Saar found that Claimant was "not fully credible" as his treatment did not support severity. (Tr. at 616). Further, Dr. Saar observed that Claimant's "problems appear related to drug use." (*Id.*). Accordingly, he concluded that Claimant's impairment was not severe. (*Id.*).

On October 13, 2010, Lisa Tate conducted a second psychological evaluation of Claimant, which consisted of a clinical interview, a mental status exam, and an intellectual assessment. (Tr. at 737-44). Ms. Tate's review of Claimant's chief complaints and presenting symptoms, as well as his narrative histories, were all largely unchanged from her prior evaluation. (Tr. at 738-39). Claimant's mental status exam reflected that his observed mood was depressed while his affect was mildly restricted. (Tr. at 740). However, his orientation, thought processes, thought content, perception, insight, judgment, concentration, and psychomotor behavior all appeared to be within normal limits or otherwise appropriate. (*Id.*). Claimant's recent memory was mildly deficient, but his immediate and remote memories were both within normal limits. (*Id.*). The results of Claimant's WAIS-IV test were considered invalid because rapport was difficult to maintain, and Claimant gave up easily on difficult tasks, worked at a slow pace, and required constant encouragement. (Tr. at 741). Ms. Tate concluded that his "IQ scores were no[t] consistent with his level of adaptive functioning, work, or educational history." (*Id.*). Claimant's Wide Range Achievement Test 4 (WRAT-4) scores corresponded with grades 6.9, 6.4, and 3.8 equivalence in reading, spelling, and math, respectively, and were considered valid. (*Id.*).

Ms. Tate diagnosed Claimant with "major depressive disorder, single episode, severe," "opioid dependence in remission with use of Suboxone" and "[b]y self report,

chronic neck pain, migraine headaches, stomach problems, and chronic back pain." (Tr. at 742). Ms. Tate documented Claimant's activities of daily living as consisting of watching television, showering every three days, going to Prestera one or two times per week, spending time outside as directed by his doctor, taking out the trash and grocery shopping monthly. (*Id.*). Ms. Tate further observed that his social functioning, concentration, persistence, and pace were all within normal limits. (*Id.*).

On January 18, 2011, Ms. Tate provided a Mental RFC opinion regarding Claimant's ability to do work-related activities. (Tr. at 795-97). Ms. Tate opined that Claimant had no limitations with respect to understanding, remembering, and carrying out simple instructions or making simple work-related decisions, but that he was mildly limited in his abilities to understand and remember complex instructions, carry out complex instructions, and make judgments on complex, work-related decisions. (Tr. at 795). Regarding social interaction, Ms. Tate opined that Claimant was mildly limited in his abilities to interact appropriately with the public, with supervisors, and with co-workers, and that he was moderately limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. at 796). Ms. Tate explained that Claimant's "level of depression may impact functioning." (Tr. at 795-96). Ms. Tate indicated that there were no other capabilities affected by his impairment. (Tr. at 796).

On January 21, 2011, Claimant's treating psychiatrist, Dr. Kambiz Soleymani, M.D., provided a mental status statement and mental RFC opinion. (Tr. at 802-05). Dr. Soleymani diagnosed Claimant with "Opiate dependence, rule out OCD," "Major depressive disorder, recurrent, moderate to severe," and hyperlipidemia and chronic back pain, as well as assigned Claimant a GAF score of 51. (Tr. at 802). Dr. Soleymani

opined that Claimant's mental impairment and symptoms were "moderate to severe" and described his prognosis as "guarded," noting that he continued to have symptoms of depression, poor motivation, insomnia, and obsession. (*Id.*). Dr. Soleymani did, however, note that Claimant has been compliant with Suboxone treatment since June 30, 2009, without relapse. (*Id.*). Dr. Soleymani opined that Claimant had no limitations with respect to understanding, remembering, and carrying out simple instructions or making simple work-related decisions, but that he was mildly limited in his abilities to understand and remember complex instructions, carry out complex instructions, and make judgments on complex, work-related decisions. (Tr. at 803). Dr. Soleymani opined that Claimant was moderately limited in his ability to interact appropriately with the public, and was "unable to answer" whether Claimant was limited in his abilities to interact with supervisors and co-workers, or to respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*).

Dr. Soleymani further observed that Claimant's symptoms were: marked as to pervasive loss of interest in almost all activities, decreased energy, recurrent obsessions or compulsions which cause marked distress, and emotional withdrawal; moderate as to his blunt/flat/inappropriate affect, generalized persistent anxiety, difficulty thinking or concentrating, emotional inability, easily distracted, memory impairment, and sleep disturbance; and mild as to his appetite disturbance with weight change, feelings of guilt/worthlessness, mood disturbance, persistent disturbances of mood or affect, seclusiveness or autistic thinking, persistent irrational fear of a specific object/activity/situation, intense and unstable interpersonal relationships, unrealistic interpretation of physical signs/sensations, and recurrent and severe panic attacks. (Tr. at 803-04). Dr. Soleymani elaborated that Claimant's response to treatment has been

poor, as he "continues having symptoms despite being on two antidepressants." (Tr. at 805).

### 2. Physical Evaluations

On September 17, 2009, a Physical RFC Opinion was completed by an unsigned examiner. (Tr. at 558-65). Because "Claimant did not allege physical allegation," no physical limitations were observed. (Tr. at 565). Claimant had previously reported a history of GERD to another treatment provider, but there were no objective findings and Claimant was "not on any medication for GERD." (*Id.*). Claimant did not report "any personal care problems due to physical problems," though he did "report[] energy problems due to his depression/medications." (*Id.*).

On September 22, 2009, N. Singh provided a case analysis. (Tr. at 566). Examiner Singh found that "based on overall evidence available, severity and limitations due to physical impairment are Non Severe." (*Id.*). There was no mention anywhere in the evaluation of any vision or eye problems.

On December 28, 2009, A. Rafael Gomez, M.D. provided a Physical RFC opinion. (Tr. at 596-603). Although Dr. Gomez noted Claimant's complaints of chronic neck pain, headaches, and stomach problems, with no mention of any vision or eye complaints. (Tr. at 603). Based upon medical records indicating that Claimant had "normal gait, normal posture, good use of all the limbs, [and] drove himself to the interview," as well as his range of activities of daily living, Dr. Gomez concluded that Claimant's "severity and limitations due to physical impairments are Non Severe." (*Id.*). Dr. Gomez did not include any physical limitations in his RFC opinion. (Tr. at 596-602).

On October 29, 2010, Davanand C. Doodnauth, M.D. conducted a thorough Internal Medicine Examination and provided a Mental RFC opinion of Claimant at the

request of the ALJ. (Tr. at 757-68). In his history of present illness, Claimant reported "having disability with his eyes," explaining "that there are fuzzy objects in his eyes," and stated that his physician had instructed "that he should not lift anything over five pounds or he would have difficulties with seeing." (Tr. at 757). Dr. Doonauth noted that Claimant "had one surgery in 2000 and two surgeries in 2001 for retinal repair" but observed that Claimant "was able to drive and pass vision tests for a driver's license without difficulty." (*Id.*). Claimant also reported "having neck pain secondary to a motor vehicle accident in 1999" and "being told that he had disc herniation at the time." (*Id.*). Claimant complained of frequent headaches and "tingling in the back of his neck with no weakness in his hands or shoulders." (*Id.*). Claimant reported his "history of severe depression" and ongoing medication treatment. (Tr. at 758). He also complained of "having difficulty with his knees having crepitus and difficulty bending." (*Id.*).

Claimant's physical examination revealed no problems in his HEENT, neck, chest, cardiac, abdomen, or extremities. (*Id.*). Regarding Claimant's vision, Dr. Doodnauth observed that his extraocular movements were intact, his pupils were "equally round and reactive to light," and his visual acuity was "20/50 right, 20/50 left, and bilateral 20/40 without the aid of corrective lenses." (*Id.*).   The remainder of Claimant's neurological exam revealed no difficulties with walking, gait, fine motor movements, rapid alternating movement, Romberg testing, or squatting, although he did show "poor balance while demonstrating heel-heel, tiptoe, and heel to toe walking." (*Id.*). Regarding Claimant's range of motion testing, Dr. Doodnauth observed "deficits at the wrists, fingers, and thumb joints bilaterally," but movement in Claimant's shoulder, elbow joint, hips, ankles, knees, lumbar spine, and lateral flexion was all normal. (Tr. at 759). Claimant had "less than adequate straight leg raise in the supine position to 85

degrees on the right and left 80 degrees," but his straight leg raise while sitting was normal. (*Id.*). Claimant's lower extremity, upper extremity, and grip strengths were normal as well. (*Id.*). Based upon the foregoing, Dr. Doodnauth diagnosed Claimant as a "Young adult male with history of retinal detachment status post repair," with "History of depression" and "Poor balance." (*Id.*).

In his discussion of Claimant's diagnosis, Dr. Doodnauth opined that Claimant "would not have any difficulty sitting, standing, moving about, and handling objects." (*Id.*). Given Claimant's poor balance, Dr. Doodnauth opined that "any activity that requires use of balance would not be appropriate including climbing ladders." (*Id.*). Dr. Doodnauth noted that Claimant's "primary issue is depression that prevents him from working." (Tr. at 759). He further observed that Claimant's "[a]ctivities of daily living do not appear to be restricted in any way." (*Id.*).

Regarding Claimant's physical RFC, Dr. Doodnauth opined that Claimant could frequently lift up to 20 lbs, occasionally lift 21 to 50 lbs, never lift 51 to 100 lbs, frequently carry up to 10 lbs, occasionally carry 11 to 50 lbs, and never carry 51 to 100 lbs. (Tr. at 761). Dr. Doodnauth opined that Claimant could sit for 4 hours, stand for 4 hours, or walk for 4 hours at one time without interruption; could sit for 6 hours, stand for 6 hours, and walk for 6 hours total in an 8 hour work day; and that he did not require a cane for ambulation. (Tr. at 762). Dr. Doodnauth opined that Claimant could frequently reach (overhead and otherwise), handle, finger, feel, push, and pull with both his left and right hands, and frequently operate foot controls with both his left and right feet. (Tr. at 763). Regarding postural activities, Dr. Doodnauth opined that Claimant could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, but that he could never climb ladders or scaffolds. (Tr. at 764). Regarding Claimant's vision,

Dr. Doodnauth opined that Claimant was not able to read very small print, but that his vision did not otherwise limit him in work related activities. (*Id.*). As for environmental limitations, Dr. Doodnauth opined that Claimant could frequently tolerate exposure to humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold, extreme heat, and vibrations; could occasionally operate a motor vehicle; and could never tolerate exposure to moving mechanical parts or unprotected heights. (Tr. at 765). Dr. Doodnauth further opined that Claimant could tolerate only moderate noise levels. (*Id.*). Finally, Dr. Doodnauth opined that Claimant could perform activities of daily living such as shopping, traveling without a companion's assistance, ambulating without a wheelchair or walker, walking a block at a reasonable pace, using standard public transportation, climbing a few steps at a reasonable pace, preparing a simple meal and feeding himself, caring for his personal hygiene, and sorting/handling/using paper or files. (Tr. at 766).

## VI.   <u>Scope of Review</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or

substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered both of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

## VII. **Analysis**

### A. Duty to Develop the Record

Claimant contends that the ALJ failed to fully develop the record regarding his vision disorder and eye problems, which included retinal holes and a retinal flap tear in his right eye. (ECF No. 14 at 10). In Claimant's view, the ALJ failed to "develop the limitations resulting from his chronic problems with his vision," and failed to "inquire as to what visual problems the claimant experiences," as his questions were "general and open ended, contrary to the regulations required to fully develop the Social Security Administration eye and vision listings." (*Id.* at 11). In response, the Commissioner argues that "the ALJ reasonably found that Plaintiff's vision impairment was not severe," particularly in light of Dr. Doodnauth's physical examination. (ECF No. 15 at 9).

It is well established that an ALJ has a duty to fully and fairly develop the record. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). Nonetheless, the ALJ need not "go to inordinate lengths" to construct a claimant's case in order to fulfill that duty. *Craft v. Apfel*, No. 97-2551, 1998 WL 702296, at *3 (4th Cir. Oct. 6, 1998) (internal quotation marks omitted). Moreover, a claimant represented by counsel may not "rest on the record ... and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008); *see also* Social Security Act, § 223(d)(5)(B), 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416.912(d). An ALJ is not required to act as a claimant's counsel; instead, his or her obligation is to collect enough evidence to allow for the issuance of a fair and reasoned decision on the claimant's application for benefits. *Bell v. Chater*, No. 95-1089, 1995 WL 347142, at *4 (4th Cir. Jun. 9, 1995) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994)); *see also Reed v. Massanari*, 270 F.3d 838, 841 (9th Cir. 2001); *Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001); *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000).

When considering whether the record before an ALJ was adequate, a reviewing court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to the claimant, and remand is warranted only when the absence of available documentation creates a likelihood of prejudice. *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir.1995). The burden to establish disability rests with the claimant. Thus, to successfully demonstrate that the ALJ relied on an insufficient record, the claimant must "indicate what evidence the ALJ failed to seek," *Rose v. Commissioner of Social Security*, No. 98-2169, 1999 WL 147618, at *2 (4th Cir. Mar. 18, 1999), and "how [the evidence] would have impacted the ALJ's assessment." *Bell*, 1995 WL 347142, at *5. Simply stated, the claimant is required to make a showing of how he or she was prejudiced by the ALJ's

alleged failure to fully develop the evidence. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).[6]

After reviewing the administrative transcript, it is evident that the record before the ALJ was adequate to establish the severity and functional limitations of Claimant's visual impairment. The ALJ had access to records of eye examinations, operative reports, agency evaluations, and Claimant's own statements relating to his vision and eyes. These records provided a clear picture of Claimant's vision and eye problems as they existed during the alleged period of disability. Claimant asserts a disability onset date of August 1, 2005, but annual eye examination records demonstrate that Claimant's vision remained intact from November 2004 to March 2007, despite his prior history of retinal detachment and repair. (Tr. at 713, 779-88). Additional records from Dr. Craig Morgan indicate that Claimant missed numerous follow-up eye appointments, implying that he had no visual issues on those dates. In June 2009, Claimant reported his vision as "good" in a physical examination conducted at Prestera, (Tr. at 436), and a nursing assessment also reflected that Claimant's pupils were equal and round, and his vision was fair, although his glasses were broken. (Tr. at 495).

Despite the availability of this evidence, the ALJ decided at the close of the administrative hearing to refer Claimant for a complete physical examination by Dr. Doodnauth, as well as a second psychological evaluation by Lisa Tate, M.A. Thus,

---

[6] The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") holds consistently with other Circuit Courts that the claimant must demonstrate prejudice from an allegedly undeveloped record in order to warrant a remand. *See McCrea v. Astrue*, 407 Fed. Appx. 394, 397 (11th Cir. 2011) ("Remand for further development of the record is appropriate when there are evidentiary gaps that result in prejudice."); *Jolivette v. Astrue*, 332 Fed. Appx. 326, 327 (7th Cir. 2009) (rejecting claim due to claimant's failure to establish prejudice); *Gabor v. Barnhart*, 221 Fed. Appx. 548, 551 (9th Cir. 2007) ("[Claimant] has not demonstrated prejudice so remand based on the ALJ's failure to develop the record is unwarranted."); *Carey*, 230 F.3d at 142 ("To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result."); *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) ("[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial.").

contrary to Claimant's assertions, the ALJ took more than adequate steps to develop and update the record. As part of the physical assessment, Dr. Doodnauth examined Claimant's vision and included specific clinical findings in his consultation report. Dr. Doodnauth found Claimant's vision to be intact as of October 2010, noting that Claimant's uncorrected vision using both eyes was 20/40. (Tr. at 758). Dr. Doodnauth also observed that Claimant "was able to drive and pass vision tests for a driver's license without difficulty," and opined that Claimant's work-related visual impairment was limited only in his ability to read very small print. (Tr. at 757, 764). This observation comports with Claimant's own testimony at the September 2010 hearing regarding his ability to drive. (Tr. at 44).

Claimant's argument that the ALJ's line of questioning was inadequate also is entirely without merit. During the September 2010 hearing, the ALJ specifically asked Claimant if, "in addition to the depression, is there anything else that limits your ability to do things," to which Claimant responded, "Other than the depression, no." (Tr. at 46). Likewise, the ALJ explicitly asked Claimant, "And, do you have any physical limitations?," to which Claimant responded, "No." (*Id.*). Furthermore, if Claimant intends to suggest that more specific questioning would have established that his visual impairments were of listing level severity, this proposition is unequivocally refuted by comparing the objective medical evidence on record to the criteria of the relevant listings. *See* 20 C.F.R. Pt. 404, Subpt P, App. 1, Part A, 2.00 (Special Senses and Speech).

The ALJ had historical records, a recent evaluation, and Claimant's testimony, all of which he plainly considered in assessing Claimant's combined functional limitations. (Tr. at 24). Accordingly, the Court finds no basis upon which to conclude that the record

was inadequate or that Claimant was prejudiced by the absence of available evidence that was crucial to a fair determination. In addition, the ALJ conducted a thorough analysis of the relevant evidence and provided a logical basis for finding that Claimant's allegations of vision problems were non-severe. Consequently, the Court finds that the ALJ followed the proper agency procedures in assessing credibility and weighing medical source opinions and his ultimate RFC finding was supported by substantial evidence.

### B. Combined Effect of Impairments

Claimant argues that the ALJ failed to consider and properly evaluate the combined effect of his impairments. (ECF No. 14 at 11-12). Claimant contends that "the totality of the claimant's medical problems, when combined, totally disable him and meet or exceed the combination of impairments listing." *(Id.* at 12).

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." 20 C.F.R. §§ 404.1525, 419.925. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990), *superseded by statute on other grounds.* Given that the Listing establishes disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified

medical criteria." *Zebley*, 493 U.S. at 530.

To demonstrate medical equivalency to a listed impairment, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a listed impairment. *Id.* at 520; *See also* 20 C.F.R. §§ 404.1526, 416.926. Under the applicable regulations, the ALJ may find medical equivalence in one of three ways: (1) if the claimant has an impairment that is described in the Listing, but (i) does not exhibit all of the findings specified in the listing, or (ii) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, then equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria;[7] (2) if the claimant's impairment is not described in the Listing, then equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment;[8] or (3) if the claimant has a combination of impairments, no one of which meets a listing, then equivalency can be proven by comparing the claimant's findings to the most closely analogous listings.[9] If the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* However, the ALJ "will not substitute [a claimant's] allegations of pain or other symptoms for a missing or deficient sign or laboratory finding" in determining whether a claimant's symptoms, signs, and laboratory findings are medically equal to those of a listed impairment. *Id.*

---

[7] *Id.* §§ 404.1526(b)(1); 416.926(b)(1)

[8] *Id.* §§ 404.1526(b)(2), 416.926(b)(2)

[9] *Id.* §§ 404.1526(b)(3), 416.926(b)(3)

As the Supreme Court explained in *Zebley*, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. "The functional consequences of the impairments ... irrespective of their nature or extent, *cannot* justify a determination of equivalence." *Id.* at 532 (citing SSR 83-19).[10] "This is because the listings permit a finding of disability based solely on medical evidence, rather than a determination based on every relevant factor in a claim." *Lee v. Commissioner of Social Security,* --Fed. Appx.--, 2013 WL 3388486, at *4 (6th Cir. July 9, 2013) (*citing Zebley*, 493 U.S. at 532). Ultimately, to determine whether a combination of impairments equals the severity criteria of a listed impairment, the signs, symptoms, and laboratory data of the combined impairments must be compared to the severity criteria of the Listing.

In the present case, the ALJ determined that Claimant suffered from the severe impairments of depression and addiction to pain killers. (Tr. at 24). Claimant fails to identify any listed impairment that he might satisfy based upon his combination of severe and non-severe impairments,[11] and cites only generally to Dr. Tucker's opinion in support of his argument that "the combined effect of the plaintiff's severe physical and mental impairments render *[sic]* him unable to function for 8 hours in any type of job."

---

[10] SSR 83-19 has been rescinded and replaced with SSR 91-7c, which addresses only medical equivalence in the context of SSI benefits for children. However, the explanation of medical equivalency contained in *Sullivan v. Zebly* remains relevant to this case.

[11] Although Claimant refers in his brief to "the combination of impairments listing," no such listing exists. (Tr. at 12).

(ECF No. 14 at 12). On the other hand, the ALJ expressly identified the listed impairments that he considered and explained why Claimant's combined impairments did not meet or medically equal any of them, including: Listing 12.04 (Affective Disorders), Listing 12.06 (Anxiety-related Disorders), and Listing 12.09 (Substance Addiction Disorders). (Tr. at 24-25).

Substantial evidence supports the ALJ's conclusion that Claimant did not satisfy any of the relevant listings. As the ALJ explained, Claimant failed to meet the requisite "Paragraph B" criteria for any of the relevant mental disorder listings, as he failed to demonstrate that his mental impairments resulted in at least two of the following: marked restriction of activities or daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (Tr. at 24). The ALJ relied almost exclusively on Claimant's own testimony to determine that Claimant had only mild restriction in his activities of daily living, moderate difficulties in his social functioning, moderate difficulties in his concentration, persistence or pace, and had experienced no episodes of decompensation of extended duration. (Tr. at 24-25). The ALJ also found that Claimant failed to meet the requisite "Paragraph C" criteria for any of the relevant mental disorder listings, as "[t]here is no documentation in this record to indicate the claimant meets" any of the following: repeated episodes of decompensation, each of extended duration; inability to adjust to even minimal workplace changes due to residual disease process; or inability to function outside of a highly supportive living arrangement. (Tr. at 25).

To the extent that Claimant argues that the overall functional consequence of his combined impairments meets the statutory definition of disability, this contention also

must fail. The Fourth Circuit stated in *Walker v. Bowen,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." 889 F.2d 47, 50 (4th Cir. 1989). The social security regulations provide that:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim*, 495 F.2d at 398. The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985). The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

An examination of the ALJ's decision confirms that he fully considered the physical and mental limitations that resulted from Claimant's medically determinable impairments and accounted for their cumulative impact on his ability to perform basic work activities. With respect to Claimant's alleged vision impairment, the ALJ explicitly "considered the claimant's alleged limitations related to this condition" and "afforded them the appropriate weight in accordance that they are not contrary to the weight of the evidence and the established residual functional capacity." (Tr. at 24). Consistent

with Ms. Tate's RFC opinion, the ALJ noted that Claimant had mild limitation in understanding and remembering complex instruction; carrying out complex instructions; and making judgments on complex instructions; mild limitation in interacting with the public, supervisors, and coworkers; and moderate limitation in responding appropriately to usual work situations and change in routine work settings. (Tr. at 25-26). Consistent with Dr. Doodnauth's observation of diminished balance, (Tr. at 759), the ALJ found that Claimant could never climb ladders or scaffolds, or work at unprotected heights, and could only occasionally climb stairs, balance, stoop, kneel, crouch, or crawl. (Tr. at 25-26). In addition, the ALJ provided a thorough review of the objective medical evidence, the subjective statements of Claimant, and the opinion evidence supporting the RFC finding. (Tr. at 25-30). Accordingly, the ALJ further restricted Claimant to light exertional work and limited him to only occasionally lifting 50 lbs; frequently lifting up to 20 lbs; sitting, standing, and walking for four hours at a time, each; sitting, standing, and walking for six hours total, each. (Tr. at 25-26). The ALJ also determined that Claimant could frequently reach, handle, finger, feel, push/pull with both hands; frequently use both feet for operation of foot controls; never work around moving dangerous machinery; occasionally operate a motor vehicle; and frequently work in humidity, dust, fumes, temperature extremes, and vibrations. (Tr. at 26).

Moreover, at the administrative hearing, the ALJ presented the vocational expert with hypothetical questions that required the expert to take into account Claimant's limitations in combination. (Tr. at 69-72). Despite being asked to assume all of these restrictions, the vocational expert opined that Claimant could perform such light and sedentary work of a non-governmental mail clerk, office helper, price marker,

surveillance system monitory, order clerk, and inspector. (Tr. at 71). The ALJ's conclusion that Claimant's combination of impairments was not so severe as to preclude him from engaging in substantial gainful activity is amply supported by the evidence of record. Accordingly, the undersigned is satisfied that the ALJ adequately considered and accounted for the overall functional impact of Claimant's combined impairments.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  August 15, 2013.

Cheryl A. Eifert
United States Magistrate Judge